IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

M.L. COCHRAN,

                    Plaintiff,

          vs.                                    Case No. 04-1172-JTM

RAYTHEON AIRCRAFT COMPANY,

                    Defendant.


MEMORANDUM AND ORDER


This is an action by plaintiff M.L. Cochran, a former employee of Raytheon Aircraft Company, alleging various claims of discrimination by Raytheon. The matter is before the court on the motion for summary judgment of defendant Raytheon. For the reasons stated herein, Raytheon's motion will be granted.

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In considering a motion for summary judgment, the court must examine all evidence in a light most favorable to the opposing party. *McKenzie v. Mercy Hospital*, 854 F.2d 365, 367 (10th Cir. 1988). The party moving for summary judgment must demonstrate its entitlement to summary judgment beyond a reasonable doubt. *Ellis v. El Paso Natural Gas Co.*, 754 F.2d 884, 885 (10th Cir. 1985). The moving party need not disprove plaintiff's claim; it need only establish that the factual allegations have no legal significance. *Dayton Hudson Corp. v. Macerich Real Estate Co.*, 812 F.2d 1319, 1323 (10th Cir. 1987).

In resisting a motion for summary judgment, the opposing party may not rely upon mere allegations or denials contained in its pleadings or briefs.  Rather, the nonmoving party must come forward with specific facts showing the presence of a genuine issue of material fact for trial and significant probative evidence supporting the allegation.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).  Once the moving party has carried its burden under Rule 56(c), the party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the material facts.  "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a **genuine issue for trial**.'"  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed.R.Civ.P. 56(e)) (emphasis in *Matsushita*).  One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and the rule should be interpreted in a way that allows it to accomplish this purpose.  *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

**Findings of Fact**

The vast majority of the facts submitted by defendant Raytheon must be deemed uncontroverted under D.Kan. Rule 56.  Consistent with that rule and Fed. R. Civ. Pr. 56 generally, the following findings exclude arguments and conclusory statements by plaintiff which are not supported by evidence, nor statements by plaintiff which are directly contrary to his prior testimony without any accounting for the discrepancy.  *See Franks v. Nimmo*, 796 F.2d 1230 (10th Cir. 1986).[1]

Cochran, an African-American man, was born on June 18, 1938.  He was first hired by

---

[1] In addition to the motion for summary judgment, the matter is also before the court on plaintiff's motion for extension of time to file a surreply.  The plaintiff's motion will be denied.  Surreplies are not contemplated by the rules of the court, *Michaud v. Duncan*, 244 F.Supp.2d 1217 (D. Kan. 2003), are both disfavored, *IMC Chemicals v. Niro*, 95 F.Supp.2d 1198, 1214 (D.Kan. 2000) and exceptional, *ANR Pipeline v. Lafaver*, 76 F.Supp. 1142, 1150 (D. Kan. 1999), and will be stricken when filed without express permission of the court.  *Willhaus v. General Host Corp.*, No. 97-1445-JTM, 1999 WL 358741, at *3 (D. Kan. May 6, 1999).  The court has previously repeatedly extended (Dkt. Nos. 40, 42) the time for plaintiff to respond to the motion for summary judgment, granting plaintiff an additional two months to present his arguments.  Plaintiff has failed to demonstrate any justification for the filing of surreply.

Raytheon at some time in 1964 or 1965.  Raytheon makes aircraft for general aviation and military use.  Cochran worked as a composite finish worker, and his job duties included routing parts for aircraft.

Throughout his employment, Cochran was classified as an hourly compensated employee, subject to the terms and conditions of the Collective Bargaining Agreement ("CBA") between Raytheon and the International Association of Machinists and Aerospace Workers. The CBA has numerous Rules of Conduct for workers to follow.

On May 24, 2000, Cochran filed a KHRC/EEOC complaint alleging discrimination and retaliation, Docket No. 25695-00W.  He filed a lawsuit pursuant to that complaint on April 26, 2002, in the U.S. District Court for the District of Kansas, Case number 02-1146-WEB.  The complaint alleged sex and race discrimination and harassment, and retaliation under Title VII.  The lawsuit alleged that Raytheon violated the law by failing to promote him or by offering promotions that were not really promotions, that various co-workers knocked tools off a shelf to distract him, used a racial slur, threw snowballs at Cochran, asked why he did not want a female co-worker, swung a crane hook, spread unspecified rumors about Cochran, placed his badge number on bad quality work, said Cochran wrote her a note asking her out, said Cochran showed her a condom, complained that Cochran showed her his private parts, and that a supervisor shot a starter or blank pistol behind his back.  The court granted summary judgment to Raytheon in the case on February 25, 2003.

Cochran filed a second complaint with the KHRC on May 19, 2003, alleging race discrimination and retaliation and age discrimination (Docket No. 27509- 04W).  The complaint was dual filed with the EEOC.  In this complaint, Cochran did not allege sex discrimination or harassment, termination, failure to promote, or that Luper withheld a sick leave paycheck.

Cochran testified that he is not sure if the signatures on the federal court complaint and other documents are his writing.  He admitted the signatures look like his writing.  Cochran has subsequently agreed that the signature is his.

The KHRC issued a cover letter with instructions as to formally filing Cochran's complaint with KHRC complaint, and stating that the complainant should not sign the complaint until any corrections that are necessary were made. The letter also states that if corrections are necessary, those should be noted on a separate piece of paper and returned to the KHRC.

Cochran filed his current KHRC complaint on May 19, 2003.  His signature was notarized by Evelyn P. Johnson on July 21, 2003.

Cochran signed a second KHRC complaint, which is an exact replica of the first, on August 29, 2003. However, his signature was notarized by Harrold E. Jones, a different notary, on that date. Accordingly, Cochran verified the accuracy and completeness of the complaint by his signature not once, but twice, before a notary.  Cochran has now agreed that the signatures are his.

In response to written interrogatories, Cochran identified the following alleged facts for each of his legal theories.

With respect to a sexual harassment, Cochran alleges that unidentified employees made loud, sexual remarks directed at him on one occasion.  He also alleges that an unidentified employee threw snowballs at him on one occasion while he was operating dangerous machinery.

With respect to racial harassment, Cochran alleges that on May 19, 2003, while he was getting ready to be escorted from the RAC plant after having been placed on a 30-day suspension, he heard an unknown person use a racial slur.  He said he heard someone say "the nigger is being fired the crazy bastard," or "the nigger is gone."  Cochran did not complain to management about the alleged remark. Cochran has stated two different versions of where he was and what was said in his deposition, compared to his handwritten notes to the KHRC.  Supervisor Kirk Luper, who was one of the people walking Cochran out, did not hear any racial remark.

With respect to gender, race, and age discrimination, Cochran claims that his supervisor, Luper, withheld a paycheck dated March 6, 2003, check number 7529316, in the amount of $555.43 because of Cochran's gender, race, age, and that Cochran had filed a previous lawsuit. Cochran also claims that a sick leave check in the amount of $158.72 was withheld from him by Luper in the past

4

because of Cochran's gender, race, age, and because Cochran had filed a previous lawsuit.  He claims that he was required by Luper to use a certain time clock for clocking in to work in the mornings because of Cochran's gender, race, age, and because Cochran had filed a previous lawsuit. He claims that he was required by Luper to use a special phone number to call in when he would not be at work because of Cochran's gender, race, age, and because Cochran had filed a previous lawsuit. And he claims that he received frivolous reprimands from his supervisor, and that he was reprimanded for other employees' work because of Cochran's gender, race, age, and because Cochran had filed a previous lawsuit.  Cochran claims that he also was not promoted because of Cochran's gender, race, age, and because Cochran had filed a previous lawsuit.  Finally, Cochran claims that he was terminated because of his gender, race, age, and that Cochran had filed a previous lawsuit. Cochran simply placed an "X" in the blank next to "termination." Cochran did not articulate his termination claim either in the remainder of the KHRC Complaint or in his responses to Interrogatories.

Raytheon's hourly employees are required to be at their work stations ready to work when their shift begins.  Cochran's shift began at 7:00 a.m.  Employees are supposed to clock in by three minutes or so before 7:00 a.m, and be in their area at starting time.  There are four time clocks on the route between the door and Cochran's department.

Cochran had a practice of utilizing the time clock closest to the building door, when coming in from the parking lot.  He would clock in on the way into the building door to ensure he was not deemed late.  Instead of clocking in at a few minutes before 7:00, though, he would clock in at 6:40 or 6:45, requiring the company to pay him before his shift started. Then he would still have to proceed to his work area and to his work station.  On many occasions during the fall of 2002, he clocked in for work at a time clock that was not in his work area.  On many occasions during the fall of 2002, Cochran was not in his work area ready to work at the beginning of his shift.

On September 24, 2002, Cochran's Section Manager and crew chief told him to use the time clock in his work area. Other workers used the clock, and Cochran had, too. After being assigned to that clock, Cochran had to pass four time clocks before he arrived at the one in his department.

Cochran refused to use the time clock in his work area on September 26, 2002, and October 2, 2002.

Cochran at first adamantly denied that he had been told to use the clock in his area. Later he admitted that indeed he had been told to use the clock in his area. But he said the clock was unplugged or purposely disabled so that he could not use it. Cochran made no attempt to tell Luper about the allegedly broken clock, nor did he try to use a different clock. According to Cochran, the clock later began to suddenly work.

On October 14, 2002, Cochran and his Section Manager had a meeting with the Union Assistant Plant Chair present and was warned about his failure to comply with the directive to use his work area time clock.

On October 17, 2002, Cochran refused to use the time clock in his work area.

On October 18, 2002, Cochran received a one-day suspension for insubordination under Rules of Conduct 49, for refusing to use the time clock in his work area, to be effective on October 21, 2002. Cochran filed a grievance regarding his one-day suspension, No. 316-09507. The grievance was denied, and later was dismissed by the union on April 25, 2003.

On October 24, 2002, Cochran refused to use the time clock in his work area.

When Luper checked the clocking records, he found that there were no problems with other employees using the clock — both before and after the time Cochran said he had trouble with the clock.

Gina Oliveria was a co-worker of Cochran's, working in department 316. She is a white female, under age forty, who had not filed a discrimination complaint. Prior to Cochran's being assigned to use the time clock in his area, she was assigned by Luper to use the time clock in her

work area for the same reason as Cochran. She, too, was clocking in at a clock outside her work area and was not in her work area at the beginning of her shift.

Luper's practice as a supervisor is to give his employees a couple of warnings about not being in their work areas by the start of shift. Usually the warning corrects the problem. However, if it does not, Luper will assign an employee to a time clock in his work area to ensure he is in his work area at the beginning of his shift. All his employees are subject to the same rules if they fail to be in their work area at the start of their shift.

Raytheon uses a "Be There" card, the size of a business card, to notify employees of who they should call in the event they will not be at work for their scheduled shift. The "Be There" card has been in use for over 30 years. The card includes the name of the department secretary and a phone number to call. Each department will have a different secretary and phone number listed for the members of that department to utilize. When a department gets a new secretary, or in a more rare event, if the phone number were to change, the cards are re-issued with the new correct information listed.

In addition to the printed number on the "Be There" card, supervisor Luper had a practice of hand-writing his name and telephone extension number on the card to give his department employees an extra number to get in touch with him, if needed. Cochran contends he was given a special number that he had to use to call in. But Cochran was provided the same "Be There" card as everyone else in his department, and may have misinterpreted Luper's extra number written on the card as meaning that only Cochran received that number and had to use it. Luper wrote his number on each and every employee's "Be There" card, in case they needed him. Cochran was not given a special number to use that no one else was given.

Cochran claims that Luper withheld a full week's paycheck from him in March of 2003. Cochran testified, "Kirk Luper had it in his office, evidently." (Cochran dep. at 96). The only evidence Cochran can cite for this belief is that some unknown, unidentified person in the local payroll department allegedly told him that Luper had his check. He does not know this unidentified

7

person's name, and cannot identify any physical description, except that it was a white male.  He states that this person told him his supervisor had it, and was holding it.

Cochran has also claimed that he received a print-out of information about the check that shows that Luper had the check.  At his November 11, 2004 deposition, Cochran claimed he had about 40 copies of the document and had already sent it to Raytheon's counsel. Raytheon's counsel informed Cochran that Cochran had not sent any such document.  Cochran agreed to bring this document to Raytheon's counsel when the second day of his deposition reconvened the next week, but did not do so.  In his response to Raytheon's summary judgment motion, Cochran again alleges the existence of this document.  Yet again, however, Cochran did not produce the document.

Cochran never went to Luper to ask for his check.  He did not complain to the payroll department, Luper's supervisor, or any other person at Raytheon that he felt his check was being held by Luper.  He did not report the alleged incident to human resources.

Raytheon utilizes an electronic clocking system to track the beginning and end of each hourly employee's shift.  Under Raytheon's payroll system, it is not possible for a local supervisor to physically withhold an employee's paycheck. Once an administrative assistant enters the employee's time on the computer, it is sent to Raytheon's payroll department in Greenville, Texas. The payroll center generates the checks for all Raytheon employees. An employee can choose to have his checks deposited electronically directly into a designated bank account. If the employee does not choose that option, the paychecks are mailed directly from Greenville to the employee's home address. Employee payroll checks do not come to Raytheon in Wichita, Kansas, either to a supervisor, or to the local payroll office.  No payroll checks physically come to the Raytheon plant.
A supervisor cannot go to the local payroll office in Wichita and pull an employee's check, or have it sent to him, as the checks do not go through Wichita, Kansas.  This payroll system has been in effect since July 2002.

Cochran did not sign up for direct deposit.  Raytheon's records reflect that Cochran's checks were mailed from Greenville directly to his Wichita home address.  Cochran verified that he did

normally receive his checks by mail.  Cochran's paycheck for the March 6, 2003, pay period, check number 7529316, was mailed to his home from Greenville, Texas. However, it was never cashed. Raytheon does not know or track what happens to the checks once they leave the payroll center, except to know whether they have been cashed.

When Raytheon's auditing system determined in early 2004, that Cochran had not cashed paycheck number 7529316, the Payroll Center in Texas issued Cochran a letter asking him to cash the check.  Cochran contacted Raytheon and said that he had not received the check.  Raytheon stopped payment on that check, and reissued a new check to him, check number 7565691, on June 24, 2004.  If someone told Cochran that Kirk Luper had Cochran's check delivered to Luper to hold it, that person does not know or understand RAC's payroll process and procedure, and they were mistaken.

No one told Cochran that a paycheck was withheld because of Cochran's gender, age, race, or retaliation; he just surmised or assumed it.  He assumes his paycheck was withheld, and assumed that the same thing has not happened to any white person.  At the same time, Cochran has claimed that sometimes his mail is stolen by neighborhood kids, acting at the direction of his Homeowner's Association.

Further, Cochran may be mixing up his paycheck situation with a clocking error incident. A clocking error occurs when the employee either does not clock in or does not clock out for the day. Supervisors are notified of clocking errors by e-mail.  Raytheon policy requires that supervisors obtain the employee's signature on a clocking slip, called an LAT form, to verify the clocking error and that the employee was present.  Supervisors then forward the clocking slip to the department administrative assistant, who enters the day's time into the payroll system.  For the pay period of February 23, 2003, Mr. Cochran had a clocking error.  Supervisor Luper received notice of this and took the clocking slip to Cochran and asked for his signature.  Cochran refused to sign the clocking slip, and said that he was not signing anything.  He refused, even though he was told that he could not be paid for the day in question unless he verified by his signature on the clocking slip that he was

at work.  After consulting his own supervisor about what to do when an employee refused to sign an LAT form, Luper held onto the slip to give Cochran some additional time to sign it.  After a couple of weeks, Luper signed the slip as Cochran's supervisor, approving the administrative assistant to go ahead and put a full day into the system for Cochran.  Cochran received payment for the entire day's work during the March 23, 2003, payroll period.  Cochran's paycheck was not "withheld" as a result of the clocking error.  The payment was delayed due to Cochran's refusal to sign the clocking slip, but Luper was paid anyway by approving the submission of the day's pay without Cochran's signature.

The complaint states, "Supervisor Luper had previously witheld (sic) a 8 hour sick leave check for the amount of 158.72. After a complaint to the union, it was paid to me."  Cochran did not state when this incident allegedly occurred.  Raytheon does not allow employees to use sick pay or vacation pay to cover disciplinary suspensions. Cochran admits  that he was suspended from work for a day, and later attempted to obtain sick leave pay for that day.

Requests to rout parts are assigned on an informal, rotating basis.  On March 6, 2003, Cochran was asked by his crew chief, Joyce Rodgers, to rout a windshield cockpit frame once he completed routing the part he was working on.  Cochran refused, saying that it was not his part.

Rodgers reported this incident to supervisor Luper. Luper went to speak with Cochran, along with a union steward, Kevin Gillespie.  Cochran again refused to rout the frame requested by his crew chief in the presence of Luper and Gillespie.  Luper told Cochran that his behavior was under investigation and that he could be disciplined, as well as terminated, because this was his second offense of Rules of Conduct 49.  He also explained Rules of Conduct 49 regarding insubordination to Cochran.

Cochran admitted to Luper and Gillespie that Joyce had directed him to rout a specific part when he was finished with his current project. He also admitted that he refused to rout the part. Luper asked him if he was still not going to rout the part. Cochran still refused.

Raytheon deemed that refusal to be insubordination under Rules of Conduct 49, which prohibits insubordination or refusing to obey orders of a foreman or other supervisor.

On March 17, 2003, Cochran was notified that he was receiving a three-day suspension for insubordination. Cochran would have been terminated, but was given extra consideration because of his length of service at Raytheon. As part of the suspension, Cochran was warned in writing that further violations of the same nature could result in termination. Cochran did not file a grievance related to the three-day suspension issue.

Kirk Luper created a spreadsheet showing windshield cockpit frames routed in the first four months of 2003, based on all 16 orders that closed out of Department 316 during that time. Cochran routed four frames; Carlton Smail routed five; Brian McDonald routed one; R. J. Scott routed three. The other three frames included a rework ("RWK") by someone, and two incidents of errors in clocking resulting in no determination of who routed those two parts. Smail is a forty-five year old white male. McDonald is a twenty-eight year old white male. Scott is a forty-four year old black male. Cochran knew that others were also routing windshield frames.

On May 19, 2003, Cochran refused his supervisor's request to perform work. This was deemed to be a violation of Rule 49 by Raytheon, and Cochran had a meeting with Luper, the general foreman, Darrell Lewis, and two union officials. On May 19, 2003, Cochran was placed on a 30-day suspension without pay for insubordination.

Cochran testified in this case that he could not remember why he received a 30-day suspension, just that he did. He remembers being called to Luper's office and remembers he received a suspension, but he does not remember the reason. He testified the reason did not really make any difference to him. He states that he never questioned why he was being suspended.

Gwenda Belmont was involved with the 30-day suspension, and drafted a memorandum to Cochran, which recited the suspension, a mandatory referral to the Employee Assistance Program, and the conditions for his return. The memorandum stated: "Failure to comply with any of the above specific conditions will result in termination." (Def. Exh. 20).

11

On a third incident of insubordination within six months, Raytheon usually terminates employment; however, Cochran was given a 30-day suspension with conditions for his return because Cochran was a long-time employee. Cochran was required to meet the following conditions to return to work after his thirty-day suspension: (a) obtain a psychological evaluation and provide it to Raytheon; (b) contact the Employee Assistance Program within 48 hours, make an appointment with a counselor and attend any recommended counseling; and (c) successfully pass a reinstatement urinalysis or an alcohol breath test.

Cochran did not meet any of the three conditions. He told Luper that there was "no way in hell" he was going to meet the conditions. In fact, Cochran did not read the conditions for his return to work because he "wasn't interested in it." (Cochran dep. at 279). He also stated that he did not take any steps to satisfy the conditions because he was 65 years old, and after the harassment and conditions to come back, he just let it go. As he stated, "I did not intend to go back." (Id.)

Cochran did not come back to work after his 30-day suspension. Cochran was involuntarily terminated by Raytheon on June 23, 2003 for failure to meet the three conditions imposed on Cochran's return to work. The notification informed Cochran that he had 72 hours to file a grievance if he disagreed with the termination. He did not file a grievance.

Cochran claims that during his employment he was not promoted because of his gender, age, race, and because he filed a prior complaint and lawsuit. In order to be considered for a higher grade level of any particular job classification, employees must fill out and submit a Job Preference Transfer Request ("JPT Request"). The JPT Request must identify each position that has a higher grade level in which the employee has an interest. The JPT Request is returned to Barbara Mayfield in the Labor Relations department, and filed in folders by job classification, based on seniority. When a certain job comes open, Mayfield will pull the file for that job classification, and begin assessing the applicants starting with the most senior. This formal system is open to any employee at any time. Raytheon does not inform particular employees of job openings in any other way. All hourly employees are subject to the same system.

Cochran did not submit a JPT Request.  He has not identified any particular job position which he believed was open, that he was qualified for, that he applied for, and for which he was not selected.  He states that there was only one job that he is claiming he did not get, a crew chief job on second shift.  Cochran admits he did not apply for the job.  He also does not know who that job went to.  Cochran claims that he was not personally informed of the job.

Raytheon retained Marc Quillen, Ph.D., to perform a psychological examination of Cochran and to serve as Raytheon's expert.  Dr. Quillen's opinion is that Cochran suffers from delusional disorder, persecutory-type and schizotypal personality disorder.

Raytheon has Equal Employment Opportunity policies that prohibit harassment, discrimination and retaliation. The EEO policies require the reporting of any such conduct.  All employees receive those policies.  Cochran did not file any internal complaint alleging retaliation, or age, race, or sex discrimination or harassment.

**Discussion**

The court grants summary judgment in favor of Raytheon on Cochran's claims of sex discrimination, sexual harassment, failure to promote, and withholding a sick leave paycheck since Cochran never presented these claims for administrative review.  The only allegations advanced in Cochran's July 24, 2003 KHRC complaint were allegations of race, age, and Title VII retaliation. He did not make any allegations concerning sexual harassment or gender/sex discrimination in his KHRC/EEOC Complaint, did not state any failure to promote claim, or allege that his termination violated the law, or that Luper withheld a sick leave paycheck.  The court hereby dismisses these claims, since they are not reasonably related to the claims which were advanced, and Cochran has failed to exhaust his administrative remedies as to those claims. *See Jones v. Runyon*, 91 F. 3d 1398, 1399 n. 1 (10th Cir. 1996).

Further, the court finds that Cochran's claims of sex discrimination, race discrimination, and retaliation under Title VII, including failure to promote, and factual allegations of race and sexual

13

harassment would in any event be barred by claim preclusion, as those claims were previously advanced and rejected by Judge Brown in *Cochran v. Raytheon Aircraft*, Slip op., Case No. No. 02-1146-WEB (D. Kan. Feb. 25, 2003).  The three elements of claim preclusion — identity of parties, identity of cause of of action, and final judgment on the merits — are clearly present here, and so serve to bar Cochran from here repeating the same general transaction which was the subject of the first, failed suit.  *See Petromanagement Corp. v. Acme-Thomas Joint Venture*, 835 F.2d 1329, 1335 (10th Cir. 1988).  Because Cochran's claims of sexual harassment, gender discrimination, failure to promote, and snowball throwing claims are repetitions of his earlier litigation, the court will grant summary judgment as to those claims.

Cochran's various complaints — that he was forced to use a specific time clock, subjected to two suspensions, not promoted, given a sick leave paycheck after a delay, subjected to a racial slur, hit by a snowball thrown by a female co-worker, not promoted, and terminated — due to age, gender, or race discrimination and retaliation also fail to present any triable issue of material fact.

First, the court finds that several of the events cited by Cochran as underlying many of his discrimination claims do not rise to the level of an adverse job action.  His various complaints regarding the paychecks fail to show that Cochran was paid differently form other employees, that he was denied payment for any substantial period of time, that his supervisor actually withheld any paycheck, or that he was denied any payment through the actions of Raytheon.  Cochran has failed to show that the requirement he use a specific time clock represents anything more than a mere inconvenience.  *Cf. Sanchez v. Denver Pub. Sch.*, 164 F.3d 527, 532 (10th Cir. 1998).  Cochran's termination, of course, represents a far more substantial detriment; it is certainly adverse, but it is not an action *of Raytheon.*  Cochran was terminated when he failed to comply with the terms for his reinstatement after his final suspension.  Cochran has failed to show how those conditions for reinstatement were in any way unreasonable.  He chose not to return to work.  And the alleged failure to promote cannot constitute an adverse job action by Raytheon, since Cochran never gave any notice

14

to Raytheon of his desire for the promotion, and has failed to show that workers from other, favored groups were treated any differently with regard to promotions.

Turning to the individual discrimination claims advanced by Cochran, the claim of age discrimination meets only the first two of the requirements of a prima facie case. *See Smith v. Midland Brake,* 138 F.3d 1304, 1312 (10th Cir.1998) (discussing standard). He is over 40 years old, and was subjected to adverse employment actions when he was suspended. But Cochran fails to demonstrate that he was performing his duties in a satisfactory manner, and indeed all of the evidence before the court establishes that at the time of the suspensions Cochran was insubordinate by refusing to perform work as directed by his supervisor and crew chief. Because Cochran has not proven that he was performing his duties satisfactorily, he has not established a prima facie case of age discrimination.

Cochran has also failed to show a prima facie case of gender discrimination. Cochran has failed to demonstrate any background circumstances which would suggest that Raytheon is "that unusual employer who discriminates against the majority," here, against males. *See Notari v. Denver Water Dep't.*, 971 F.2d 585, 589-590 (10th Cir. 1992) (citations and internal quotations omitted). There is no evidence that Raytheon is such an employer. Further, there is neither direct nor indirect evidence that the adverse job actions in this case were the product of anti-male discrimination. There is no evidence that Raytheon or its agents directed any anti-male comments to Cochran, or suggested that gender played any role in employment decisions. The only basis for the gender discrimination claim which Cochran could advance in his response to interrogatories is the fact that some unknown female co-worker once threw snowballs at him, and that on one other occasion another unknown co-worker directed sexual remarks to him. Whether this may constitute a hostile environment is addressed below. But the case certainly fails to establish indirect evidence that Raytheon differentially treats workers differently according to their gender. Cochran has failed to show instances in which similarly-situated female workers were treated differently in cases of insubordination.

15

And the court finds that Cochran has failed to establish a prima facie case of race discrimination.  As noted earlier, many of Cochran's claims, such as directions as to which time clock he was required to use, simply do not rise to the level of an adverse employment action.  For others, such as the failure to promote claim, Cochran has failed to show that persons outside the protected group (here, white workers) were promoted without giving any notice to Raytheon requesting a promotion.  For the remaining claims, Cochran meets at most two prongs of the standard for prima facie discrimination:  he is black, and was subjected to adverse employment actions when he was suspended.  However, as noted above, the uncontroverted evidence also establishes that Cochran was not performing his job satisfactorily when he refused the work directions of his supervisor and crew chief.

Summary judgment is appropriate as to Cochran's retaliation claim since the evidence fails to support even a prima facie case.  The uncontroverted evidence regarding Raytheon's pay practices establishes that Cochran's supervisor did not keep one of his paychecks in his office; Cochran's allegations based on conjecture and hearsay do not support a different conclusion.  The first significant adverse action, as noted above, was the first suspension of Cochran which was imposed on  October 21, 2002.  This was more than six months after Cochran's 2001 administrative complaint and his first lawsuit on April 26, 2002.  This is too long a time to create an inference of retaliatory motive.  *Anderson v. Coors Brewing*, 181 F.3d 1171, 1179 (10th Cir. 1999).  And Cochran has failed to provide any other evidence from which the court could infer a retaliatory motive.  Indeed, as noted above, all of the evidence establishes that there was an independent and legitimate rationale for the suspensions.

However, even assuming that Cochran had presented a prima facie case of discrimination, summary judgment would still be warranted because Raytheon has presented legitimate, nondiscriminatory reasons for its employment actions, and Cochran has failed to provide evidence that those reasons are pretextual.  With respect to the time clock incident, Cochran has failed to show that other workers who were treated differently.  Indeed, the evidence before the court establishes

16

that the company was implementing a general policy that all workers be in their work area at the time they clocked in, rather than somewhere within the large Raytheon factory grounds, and that a female co-worker of Cochran received similar instructions to use the time clock in her work area. The three-day suspension later imposed on Cochran follows from the general company rule requiring workers to follow the work directions of supervisors and crew chiefs. The evidence establishes that other workers outside the protected classes were expected to and did perform the windshield routing work which Cochran refused to do. The remaining complaints advanced by Cochran, such as the paycheck which supervisor Luper supposedly concealed from Cochran, are as discussed earlier, simply unsupported by admissible evidence or fail to demonstrate any adverse job action.

Finally, the court notes that Cochran's claims of sexual and racial harassment should also be dismissed because he has failed to demonstrate that the remarks created a hostile working environment. Here, Cochran has identified only a single instance of racial harassment during his long career at Raytheon, in which an unidentified co-worker allegedly used a racial slur while he was being escorted off the plant after he was suspended. He has identified two instances of alleged sexual harassment — one incident in which an unidentified co-worker threw snowballs at him, and one instance in which an unidentified co-worker used "loud" sexual remarks within his hearing. All of these instances appear to have been brief and were never repeated. Each of these incidents involved purely verbal conduct except for the snowball throwing, and the evidence fails to establish that the snowball incident was prompted by any particular discriminatory animus. Accordingly, these events appear to be the sort of isolated incidents which will not be deemed to have created a pervasively hostile work environment which altered the conditions of the working environment. See, e.g., *Faragher v. Boca Raton*, 524 U.S. 775, 786 (1998).

IT IS ACCORDINGLY ORDERED this 16th day of May, 2005, that the defendant's Motion for Summary Judgment (Dkt. No. 36) is granted; plaintiff's Motion for Leave (Dkt. No. 50) is denied.

s/ J. Thomas Marten

J. THOMAS MARTEN, JUDGE